UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

       -v-                 :    **INDICTMENT**

JOSEPH SHERESHEVSKY,         :    S2 08 Cr. 1092 (DC)
     a/k/a "Joseph Heller,"
     a/k/a "Josie,"           :
     a/k/a "Yossi,"
                        :

               Defendant.    :

- - - - - - - - - - - - - - - - - - x

## COUNT ONE

(Conspiracy to Commit Securities Fraud,
Mail Fraud and Wire Fraud)

    The Grand Jury charges:

### RELEVANT PERSONS AND ENTITIES

    1.   At all times relevant to this Indictment, WexTrust Capital LLC ("WexTrust Capital") purported to be a globally diversified private equity company specializing in investments in real estate and specialty finance opportunities.  WexTrust Capital was headquartered in Chicago and had offices in New York, New York; Norfolk, Virginia; Atlanta, Georgia; Boca Raton, Florida; Nashville, Tennessee; Ramat Gan, Israel; and Johannesburg, South Africa.  WexTrust Capital was founded in 2003 and was affiliated with several companies of a similar name, including Wexford Bancgroup; WexTrust Equity Partners, a/k/a Wexford Equity Partners, and WexTrust Securities, LLC, a broker-

1

dealer registered with the United States Securities and Exchange Commission ("SEC").

2.    At all times relevant to this Indictment, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, was one of the principals of WexTrust Capital, and, until in or about June 2008, served as the company's Chief Operating Officer.  SHERESHEVSKY has two prior felony convictions, including one felony fraud conviction. Specifically, in or about 1994, SHERESHEVSKY pleaded guilty in United States District Court for the Southern District of New York to one count of conspiracy to commit bank fraud.

3.    At all times relevant to this Indictment, Steven Byers, a co-conspirator not named as a defendant herein, was WexTrust Capital's founder and its Chief Executive Officer.

## OVERVIEW OF THE SCHEME TO DEFRAUD

4.    From in or about 2003, up to and including in or about August 2008, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, Steven Byers, and others known and unknown, raised funds from investors, typically through a private placement memorandum ("PPM"), used material portions of the raised funds for purposes other than those specified in the PPM for that offering, and did not disclose these diversions of funds to investors.

5.    In furtherance of the scheme, JOSEPH SHERESHEVSKY,
a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the
defendant, Steven Byers, and others known and unknown, sought to
and did make materially false and misleading statements, and
material omissions, in private placement documents distributed to
investors by WexTrust Capital.

6.    In furtherance of the scheme, JOSEPH SHERESHEVSKY,
a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the
defendant, Steven Byers, and others known and unknown, also
caused documents to be distributed to investors, including
private placement documents, that failed to disclose
SHERESHEVSKY's criminal history, notwithstanding the fact that
many of WexTrust Capital's offering documents featured
SHERESHEVSKY's role in WexTrust Capital and his professional
experience.

7.    From in or about 2003 up to and including in or about
2008, WexTrust Capital issued private placement offering
documents for dozens of private offerings, including those
described herein.  Through these private offering documents,
JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a
"Yossi," the defendant, Steven Byers, and others known and
unknown, falsely represented that monies raised from investors
would be used to purchase specific properties identified in the
offering documents pursuant to which the monies were raised.  In

3

fact, SHERESHEVSKY, Byers, and others known and unknown, operated a Ponzi scheme, whereby they directed that material portions of monies raised from investors for specified properties be diverted for other purposes, including to fund other, unrelated WexTrust investment projects and to pay investors their "returns" in connection with other, unrelated WexTrust investment projects. As a result, SHERESHEVSKY and Byers, through WexTrust Capital and its affiliates (collectively, "WexTrust"), were able to close on properties that otherwise could not have been purchased by the designated closing date; pay distributions to investors in non-performing properties; and attract additional investor money by creating the false impression that WexTrust was a profitable business.  In reality, as of November 2007, WexTrust had been operating at a deficit for years.

**The Foreclosed Properties Fraud**

8.    In or about 2003 and 2004, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, and Steven Byers, through WexTrust Capital, issued private placement memoranda to raise money to invest in several apartment complexes owned by WexTrust Capital or an affiliate, including the two properties described in paragraphs 9 to 12 below.  The properties were foreclosed upon not long after the equity raises took place, and investors were not informed of the foreclosures.  Instead, and as described below, investors in these properties continued to

4

receive periodic dividend payments, even though the properties were no longer owned by WexTrust Capital or any of its affiliates. The effect of this was to conceal that WexTrust Capital investments were doing poorly, which in turn enabled SHERESHEVSKY, Byers, and others known and unknown to continue raising investor money for new projects.

9.    On or about January 23, 2003, WexTrust Capital issued a Limited Offering Memorandum seeking to raise $930,000 through the sale of Membership Units of ownership in Carlisle Park, LLC. According to the Operating Agreement for Carlisle Park, LLC, the sole purpose of Carlisle Park, LLC was to "acquire, own, hold and maintain 50% of Carlisle Apartments, LLC, which owns 100% of Carlisle and Park Westwood Apartments in Houston, Texas." The Operating Agreement further represented that "each individual Member" would be entitled to a "12% Preferred Return," and that the 12% Preferred Return will be distributed in monthly payments of 1%."

10.   On or about April 6, 2004, the Carlisle Apartments property was foreclosed upon. The fact that a WexTrust entity no longer owned this property was confirmed by JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, in an e-mail dated August 9, 2004, in which he informed Steven Byers and a co-conspirator not named as a defendant herein ("CC-1") that "we don't own [Carlisle] anymore." Nevertheless, as

5

SHERESHEVSKY knew, individuals who had invested in Carlisle
Apartments were not informed of the foreclosure and continued to
receive purported dividends on their investment.

11.  On or about March 1, 2004, WexTrust Capital issued a
Private Offering Memorandum for Hilltop Ridge Investors, LLC,
seeking to raise $800,000 from the sale of 80 units.  According to
the offering memorandum, Hilltop Ridge Investors, LLC, was formed
"with the purpose of owning Membership Units that give the
investors interest in a[n] ... apartment complex known as Hilltop
Ridge Apartments" located in North Carolina.  The offering
memorandum further represented that "[t]he investors will receive
a preferred position and receive the greater of 20% of the cash
flow or a 12% dividend yield," and that "[u]pon a liquidity event
the investors will receive the return of equity, any unpaid 12%
minimum return, and then 20% of the net proceeds."  According to
the offering memorandum, the amount of debt on the property was
$7.760 million, and the estimated value of the property was over
$9 million.

12.  In or about early 2005, the Hilltop Ridge property was
sold for approximately $6 million in a foreclosure proceeding.
Despite losing the property to foreclosure, WexTrust Capital
continued to mail periodic payments to investors in Hilltop Ridge,
including to at least one investor located in the Southern
District of New York, designed to lead investors to believe that

Hilltop Ridge was still owned by WexTrust Capital or an affiliated entity, and that the property continued to be profitable.

**Private Placement Offerings From 2004 To 2008**

13. From in or about 2004 up to and including on or about August 11, 2008, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, together with Steven Byers, continued to raise money through dozens of private placement offerings. Rather than maintaining segregated accounts for each offering, as represented in the PPM, investor monies were transferred freely between WexTrust accounts, at the direction of SHERESHEVSKY and Byers. Among other things, and as illustrated in paragraphs 15 to 42 below, money from one investment fund was frequently used to facilitate the closing on another property or to fund other, unrelated expenses, such as employee payroll or investor distributions for other under or non-performing investment properties.

14. In addition, the private placement memoranda for the offerings, while emphasizing the experience of JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, did not disclose his criminal background.

**March 2005 Offering For Gold Coast, a/k/a Days Inn, a/k/a Parkview**

15. In or about March 2005, WexTrust Capital issued a PPM (the "Gold Coast PPM") seeking to raise $9 million through the sale of 90 Preferred Interests in Gold Coast Investors, LLC, a

company formed to acquire and renovate a Days Inn hotel located in the Gold Coast area of Chicago.  The Gold Coast PPM represented that "[p]rior to the closing" of the offering, "all subscription proceeds w[ould] be held in a segregated account," and that "funds received from subscribers" could not be used until at least $7.6 million had been raised and a closing had occurred.

16.  Contrary to the representation in the Gold Coast PPM regarding the use of funds, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, Steven Byers, and others known and unknown, caused material amounts of the monies raised in connection with the Gold Coast offering to be used for other purposes, including to fund the closings of other WexTrust properties.  From in or about July 2005 through in or about September 2005, four transfers totaling over $8 million were made from a Gold Coast bank account to four separate accounts to fund the closings of other, unrelated investment properties. Specifically, on or about July 14, 2005, approximately $4.5 million was transferred to fund the July 15, 2005 closing of a residential investment property located on Grant Street in Hinsdale, Illinois (the "Grant Street Property"); on or about August 30, 2005, approximately $1 million was transferred to fund the closing of an investment property known as "Park Village"; on or about September 9, 2005, approximately $1.332 million was transferred to fund the closing of an investment property known as

8

"West Bearden"; and on or about September 29, 2005, approximately $1.416 million was wired to a bank account for an investment property known as "River's Edge."

17.  As a result of the diversion of funds, Gold Coast bank accounts contained insufficient funds for the closing on the purchase of the Gold Coast property.  Thus, from in or about September 2005 through in or about December 2005, a number of money transfers were made into Gold Coast bank accounts from bank accounts corresponding to other, unrelated WexTrust investments which, like the Gold Coast investment project, were subject to use of funds restrictions.  The amount of money transferred into the Gold Coast bank accounts from other unrelated investment fund accounts from in or about September 2005 to in or about December 2005 totaled over $4 million.

**June 2005 Grant Street Offering**

18.  On or about June 30, 2005, WexTrust Capital issued a private placement memorandum seeking to raise $6.5 million through the sale of 130 Preferred Membership Interests for the purchase of a residential complex located on Grant Street in Hinsdale, Illinois (the "Grant Street PPM").  The Grant Street PPM stated that a company called Grant Street Investors, LLC, had been organized to own a membership interest in GSH Development, LLC, which was being formed to acquire and develop the Grant Street Property.  The Grant Street PPM represented that "[p]rior to the

9

closing" of the offering, "all subscription proceeds will be held in a segregated account," and that "funds received from subscribers" could not be used "until such time as subscriptions for Preferred Interests in an aggregate amount of at least $5,000,000" had been received and a closing had occurred.

19.  Rather than raising the necessary funds prior to closing, as represented in the Grant Street PPM, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, and Steven Byers funded the July 2005 purchase of the Grant Street Property using $4.5 million taken from an account pertaining to the Gold Coast/Days Inn hotel property described above.  After the closing on the purchase of the Grant Street Property, moreover, SHERESHEVSKY and Byers continued to raise money from investors in connection with the Grant Street PPM offering, and used material amounts of those monies for purposes other than those specified in the Grant Street PPM.  Specifically, in or about August and September 2005, hundreds of thousands of dollars were taken out of the segregated bank account described in the Grant Street PPM and containing funds from investors in the Grant Street offering (the "Grant Street Account") and transferred to bank accounts pertaining to unrelated WexTrust investments in Africa, as well as to fund the closing of another investment property and to cover payroll.

20.  In addition, the Grant Street Account was used as a

10

conduit for the transfer of funds between other, unrelated
accounts.  For example, on or about October 24, 2005,
approximately $250,000 was transferred into the Grant Street
Account from two other unrelated accounts to "fund" a "wire to PAI
(Vaticano)," a WexTrust investment vehicle involving diamond mines
in Africa, and on that same day, $250,000 was transferred from the
Grant Street Account to an account in the name of "Brandon,"
another WexTrust investment vehicle in Africa, "to fund" a "wire
to PAI (Vaticano)."

**September 2005 River's Edge Offering**

21.    On or about September 8, 2005, WexTrust Capital issued a
PPM seeking to raise $3.080 million through the offering of 380
Preferred Interests in River's Edge Investors, LLC (the "River's
Edge PPM"), a company organized to own a membership interest in
2825 Oakley LLC, which in turn was formed to acquire and organize
a 19-unit residential complex in Chicago.  According to the
River's Edge PPM, "[p]rior to the closing" of the offering, "all
subscription proceeds will be held in a segregated account" (the
"River's Edge Account"), and "funds received from subscribers"
could not be used "until such time as subscriptions for Preferred
Interests in an aggregate amount of at least $3,080,000" had been
received and a closing had occurred.

22.    The closing on the purchase of the River's Edge
property took place on or about September 30, 2005.  Approximately

11

$1.416 million of the $1.515 million used for the closing was money that had been diverted from a Gold Coast/Days Inn bank account the day before.  Contrary to the representations in the River's Edge PPM, from in or about October 2005 to in or about January 2006, hundreds of thousands of dollars raised post-closing were wired out of the River's Edge Account to "fund," among other things, payroll and WexTrust investment funds in Africa unrelated to the River's Edge investment project.

**July 2007 Hammond Industrial Offering**

23.  On or about July 2, 2007, WexTrust Capital issued a private placement memorandum seeking to raise $7 million through the sale of Preferred Membership Interests in Hammond Industrial Holdings, LLC (the "Hammond Industrial PPM"), a company formed "to acquire, operate, sell, refinance, mortgage and otherwise use and own for profit a Class A industrial facility located in Hammond, Louisiana."  The Hammond Industrial PPM further represented that prior to the closing of the offering, all investor funds would be held in a segregated account, and that funds received from investors would not be used "until such time as subscriptions for Preferred Interests in an aggregate amount of at least $2,000,000 have been received and a closing occurs."

24.  The closing on the purchase of the Hammond property took place on or about July 18, 2007, using $1.872 million that had been diverted to Hammond Industrial Holdings, LLC, from a WexTrust

12

Capital operating account.  In the month that followed, over $2 million raised from investors in connection with the Hammond property was transferred out of the bank accounts set up specifically for Hammond Industrial investor funds and used for purposes other than those permitted in the Hammond Industrial PPM, including to fund payroll, as well as unrelated WexTrust investment properties.

### August 2007 Crowne-Phoenix Offering

25.  On or about August 8, 2007, WexTrust Capital issued a private placement memorandum seeking to raise $9.3 million through the sale of Preferred Membership Interests in Crowne-Phoenix Investors, LLC, a real estate LLC formed to acquire an interest in a Crowne Plaza Hotel in Phoenix, Arizona.  According to the Crowne-Phoenix private placement memorandum ("Crowne-Phoenix PPM"), the money raised would be used for part of the purchase of the hotel, improvement of the hotel property, acquisition and closing fees, interest reserve, and equity costs.

26.  Despite the representation in the Crowne-Phoenix PPM regarding the use of funds, and as JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, and Steven Byers knew, a material portion of the raised monies were used for other purposes, including to cover payroll for WexTrust Capital and certain other WexTrust affiliates; to make deposits for two investment properties unrelated to the Crowne-Plaza

13

investment; to pay distributions to investors of other WexTrust
affiliated investments; and as loans to other WexTrust affiliates.
In or about October and November 2007 alone, over $2 million were
transferred out of a Crowne-Phoenix Escrow account to a WexTrust
Capital account for a "loan," as directed by SHERESHEVSKY; to help
fund payroll transfers; and to help fund other investments
unrelated to Crowne Plaza.

### The GSA Private Placement Fraud

27.  In at least one instance, and as explained below,
investor funds raised in connection with a particular WexTrust
Capital investment project were diverted in their entirety, and
the properties that were supposed to be purchased, as represented
to investors in offering documents, were never bought.

28.  On or about November 22, 2005, WexTrust Capital issued a
PPM for the purchase and sale of "preferred membership interests"
in GSA Investors, LLC (the "GSA PPM"). According to the GSA PPM,
GSA Investors, LLC, was a company formed to purchase and operate
seven commercial properties, located in Wisconsin, Illinois,
Indiana and Florida, that were leased to the GSA (the seven
properties are hereafter called the "GSA Properties"). The GSA
PPM specified that $9.2 million raised from investors, together
with a mortgage of approximately $21 million, would be used to
purchase the GSA Properties and cover related acquisition
expenses. The GSA PPM specified no other uses for the funds

14

raised.  In addition, the Operating Agreement for GSA Investors,
LLC (the "Operating Agreement"), which was attached as an exhibit
to the GSA PPM and purported to govern the operations of GSA
Investors, LLC, prohibited the co-mingling of GSA Investors, LLC
funds with any other investments or entities.  The Operating
Agreement also prohibited loaning funds from GSA Investors, LLC to
any person or entity.  The Operating Agreement was sent to
investors in GSA Investors, LLC as an attachment to the GSA PPM.

29.  As JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a
"Josie," a/k/a "Yossi," the defendant, and Steven Byers knew, the
GSA Properties were never purchased by GSA Investors, LLC, or any
other WexTrust-related entity, and the investor funds raised
pursuant to the GSA PPM by SHERESHEVSKY, Byers, and others, were
diverted to other uses not specified in the GSA PPM or the
Operating Agreement, and not disclosed to investors.  In fact, GSA
Investors, LLC, did not acquire any real property.

30.  In an e-mail dated January 31, 2006, JOSEPH
SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi,"
the defendant, asked Steven Byers whether they should "have a plan
on [how] to get [GSA] over within the year" and "give back the
money" to investors in GSA Investors, LLC.  Rather than informing
the GSA investors that their investment funds had been diverted to
other uses, SHERESHEVSKY, Byers, and others known and unknown
continued to misrepresent that the funds had been used to purchase

15

the GSA Properties.  In fact, in or about 2007 and 2008, WexTrust
Capital mailed Internal Revenue Service ("IRS") Schedule K-1 forms
to investors in GSA Investors, LLC, that falsely represented
income earned from their purported investment in the GSA
Properties.  As SHERESHEVSKY and Byers knew, no such income was
earned because no money was invested in the GSA Properties.

    31.  In addition, in or about 2007 and 2008, WexTrust Capital
mailed to investors in GSA Investors, LLC (1) quarterly "cash flow
statements" that falsely reported revenue and expenses associated
with their purported investment in the GSA Properties; and
(2) quarterly reports that falsely represented that certain
capital expenditures existed in connection with the GSA
Properties, and that investors had received "distributions" that
purported to be excess cash from the operation of GSA Investors,
LLC, even though no excess cash in fact existed.

    32.  Throughout 2006 and 2007, money raised in connection
with the GSA Properties fund was used for purposes unrelated to
the purchase of the GSA Properties and not disclosed to investors.
More than two years after raising funds from investors pursuant to
the GSA PPM, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a
"Josie," a/k/a "Yossi," the defendant, Steven Byers, and others
known and unknown, still had not informed the investors in GSA
Investors, LLC, that their investment money had been diverted and
misused.  Instead, in or about mid-2008, SHERESHEVSKY, Byers, and

16

others agreed to fabricate a story for the GSA investors to conceal their material misrepresentations in the GSA PPM and the Operating Agreement. Among other things, on or about June 18, 2008, in a consensually recorded meeting, SHERESHEVSKY told CC-1 about the suggestion made by Byers that WexTrust send a letter to GSA investors, "[p]re-date it like two years," and have the letter falsely state that there was a "title problem" with the GSA Properties. SHERESHEVSKY also told CC-1 that he planned to buy out some of the GSA investors, that is, "take ... out" for approximately $2 million all the investors in GSA Investors, LLC "that aren't friendly." SHERESHEVSKY further said he would take out mortgages on his five personal houses for another $2 million and put the proceeds into GSA Investors, LLC, and that doing so was "better than somebody going to jail."

33. In addition to fabricating a story to tell GSA investors about what had been done with their investment monies, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, and Steven Byers, devised ways to recoup the GSA investor funds by diverting money from other WexTrust Capital investment funds, including WexTrust Capital's purported Africa diamond mine investments.

34. For example, on or about June 24, 2008, in a consensually recorded meeting in New York, New York, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi,"

17

the defendant, told CC-1 that he would raise money from investors through a new WexTrust Capital investment vehicle involving African diamond mines and divert that money to pay off investors in GSA Investors, LLC:

> once I have that whole thing done and raised I believe I can take care of GSA, I can take care of . . . any other problem that we have. I have no problem telling people [other WexTrust Capital investors], 'go fuck yourself you lost your money.'

### The West 82nd Street Condominium Fraud

35.  On or about October 25, 2006, WexTrust Capital issued a private placement memorandum seeking to raise $8.470 million through the sale of Preferred Membership Interests in West 82nd Street Investors, LLC (the "West 82nd Street PPM"), a company formed to acquire and develop a residential complex on the Upper West Side of Manhattan.

36.  The West 82nd Street PPM represented that the equity raised, in combination with a $22 million mortgage, would be used to purchase the building as well as develop and construct the condominium residences in the building.  The West 82nd Street PPM further represented that "upon a sale of the condominium units ... the net distributable proceeds ... [would] be distributed as follows: first, to the Preferred Members in an amount equal to the Preferred Members' unrecovered invested capital..."  The closing on WexTrust's purchase of the West 82nd Street property took place on or about November 16, 2006.

18

37.  Later, in or about 2007, representatives of WexTrust Capital began to negotiate the sale of the West 82nd Street Property to a third party.  In a letter dated December 18, 2007 that was mailed to West 82nd Street investors, including investors located in the Southern District of New York, WexTrust Capital stated that the closing on the sale of the West 82nd Street Property would take place soon, and that "within a few weeks of closing" WexTrust would "return your principal investment plus additional return."

38.  On or about February 25, 2008, Steven Byers sent an e-mail to JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, about diverting the proceeds from the sale of West 82nd Street to repay other properties from which money had previously been diverted.  Among other things, Byers stated:

> We will be closing on W. 82nd very soon.  We can use the money but obviously we used $1.1 million for the Gold Coast [Days Inn] and another $1.6 million for Crown [Phoenix] for which we raised but never paid back....

Byers further stated that "[i]t would help if some of the investors" in the West 82nd Street project were not paid back from the proceeds of the sale of that building but rather were "move[d] into the GDR," referencing a separate WexTrust Capital investment fund.

19

39.  On or about February 27, 2008, the West 82nd Street property was sold by WexTrust Capital to a third party for approximately $18 million.  Approximately $7 million, constituting the net proceeds from the sale, were sent via wire transfer to a bank account of WexTrust Capital in the name of West 82nd Street Investors, LLC.

40.  On or about February 28, 2008, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, sent an e-mail to Steven Byers and CC-1, who was in New York, New York, stating that they had "a week or 10 days to disburse the funds" from the sale of the property.  SHERESHEVSKY said that during that time frame, the money should be used for other purposes, such as to "[c]over the distributions" and to "[c]over the payroll."  SHERESHEVSKY also said that $400,000 should be wired to "Africa accounts," specifically "PAM." SHERESHEVSKY demanded that "these things [be] done" that morning. Later that day, several wire transfers were made out of the West 82nd Street bank account, including one for approximately $400,000 that was wired to an account in the name of PAM.

41.  In addition, on or about March 11, 2008 approximately $370,000 was wired from a West 82nd Street account to an account in the name of Gold Coast/Days Inn, a property also known as Parkview; and a $900,000 wire transfer was made out from a West

82nd Street bank account to pay a bank loan for another property
unrelated to the West 82nd Street property.

42.   During a recorded conference call to investors held on
or about June 24, 2008, Steven Byers stated that due to an
"internal company error" the principal invested in West 82nd Street
could not be returned because it had been re-invested in GDR.
Byers falsely stated that this had been "human error" and that
"the overall company is ... doing very well right now."

### THE CONSPIRACY

43.   From in or about 2003, up to and including in or about
August 2008, in the Southern District of New York and elsewhere,
JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a
"Yossi," the defendant, together with others known and unknown,
unlawfully, willfully, and knowingly did combine, conspire,
confederate, and agree together and with each other to commit
offenses against the United States, to wit, (a) to commit
securities fraud, in violation of Sections 78j(b) and 78ff of
Title 15, United States Code, and Title 17, Code of Federal
Regulations, Section 240.10b-5; (b) mail fraud, in violation of
Title 18, United States Code, Section 1341; and (c) wire fraud, in
violation of Title 18, United States Code, Section 1343.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

44.    It was a part and an object of the conspiracy that
JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a
"Yossi," the defendant, and others known and unknown, unlawfully,
willfully, and knowingly, by the use of the means and
instrumentalities of interstate commerce, the mails, and the
facilities of national securities exchanges, directly and
indirectly, in connection with the purchase and sale of
securities, would and did use and employ manipulative and
deceptive devices and contrivances in violation of Title 17, Code
of Federal Regulations, Section 240.10b-5, by (a) employing
devices, schemes, and artifices to defraud; (b) making untrue
statements of material facts and omitting to state
material facts necessary in order to make the statements made, in
the light of the circumstances under which they were made, not
misleading; and (c) engaging in acts, practices, and courses of
business which operated and would operate as a fraud and deceit
upon a person, in violation of Title 15, United States Code,
Sections 78j(b) and 78ff.

### Mail Fraud

45.    It was further a part and an object of the conspiracy
that JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie,"
a/k/a "Yossi," the defendant, and others known and unknown,
unlawfully, willfully, and knowingly, having devised and intending

22

to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, would and did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and would and did deposit and cause to be deposited matters and things, to be sent and delivered by private and commercial interstate carriers, and would and did take and receive therefrom such matters and things and knowingly would and did cause to be delivered by mail and such carriers according to direction thereon, such matters and things, all in violation of Title 18, United States Code, Section 1341.

## Wire Fraud

46. It was further a part and an object of the conspiracy that JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, all in violation of Title 18, United States Code, Section 1343.

## MEANS AND METHODS OF THE CONSPIRACY

47.  Among the means and methods by which JOSEPH

SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi,"

the defendant, together with others known and unknown, would and

did carry out the conspiracy were the following:

a.  SHERESHEVSKY, Byers, and others known and unknown,

raised money from investors pursuant to private placement

offerings.

b.  SHERESHEVSKY, Byers, and others known and unknown,

diverted material portions of the investor funds raised to

purposes other than those specified in the private placement

memoranda pursuant to which the funds were raised, and failed to

disclose the diversion of funds to investors.

c.  SHERESHEVSKY, Byers, and others known and unknown,

created or caused to be created false and fraudulent documents

that falsely reflected profits earned by WexTrust Capital

investors.

d.  SHERESHEVSKY, Byers, and others known and unknown,

caused WexTrust Capital and its representatives to make materially

false, fraudulent and misleading statements in documents

distributed to investors that materially misstated, among other

things, WexTrust Capital's expenditures and income related to GSA

Investors, LLC.

e.  SHERESHEVSKY, Byers, and others known and unknown,

used facilities of interstate commerce, including interstate

telephone calls and interstate wire transfers, as well as the mails, in furtherance of the objects of the conspiracy.

## OVERT ACTS

48.  In furtherance of said conspiracy and to effect the illegal objects thereof, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, and others, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.  On or about December 21, 2005, SHERESHEVSKY directed that approximately $890,000 be transferred out of a bank account held in the name of the WexTrust investment fund WexFord High Yield Debt Fund I, LLC, to a bank account for an unrelated hotel development project that was the subject of a separate WexTrust investment fund.

b.  On or about November 9, 2006, a WexTrust Capital employee mailed a letter to an investor in GSA Investors, LLC, in the Bronx, New York, containing the Operating Agreement of GSA Investors, LLC.

c.  In or about 2007, a WexTrust Capital employee mailed a letter to an investor in GSA Investors, LLC, in the Bronx, New York, containing a 2006 IRS Schedule K-1 form reflecting "income" from GSA Investors, LLC.

d.  In or about 2007, a WexTrust employee mailed a letter to an investor in GSA Investors, LLC, in Westchester County, New York, containing a 2006 IRS Schedule K-1 form reflecting "income" from GSA Investors, LLC.

e.    On or about November 19, 2007, SHERESHEVSKY sent an e-mail to BYERS and CC-1.

f.    On or about January 2, 2008, SHERESHEVSKY directed a transfer of approximately $270,000 from a bank account in the name of the WexTrust investment fund Wexford High Yield Debt Fund III, LLC, to a bank account in the name of "Jassry Properties."

g.    On or about February 28, 2008, SHERESHEVSKY sent an e-mail to Byers and CC-1 regarding West 82nd Street Condominium, LLC.

h.    On or about April 13, 2008, a WexTrust Capital employee mailed a letter to an investor in GSA Investors, LLC, in the Bronx, New York, containing a 2007 IRS Schedule K-1 form reflecting "income" from GSA Investors, LLC.

i.    On or about June 24, 2008, SHERESHEVSKY met with CC-1 in New York, New York, to discuss problems with GSA Investors, LLC, as well as other WexTrust Capital projects.

j.    On or about June 24, 2008, WexTrust Capital held a conference call for investors in West 82nd Street Condominium, LLC.

k.    In or about 2008, a WexTrust Capital employee mailed a letter to an investor in GSA Investors, LLC, in the Bronx, New York, containing a quarterly report for GSA Investors, LLC.

1.    In or about 2008, a WexTrust Capital employee mailed a letter to an investor in GSA Investors, LLC, in the Bronx, New York, containing a "cash flow statement" for GSA Investors, LLC.

(Title 18, United States Code, Section 371.)

### COUNTS TWO THROUGH FOUR

(Securities Fraud)

The Grand Jury further charges:

49.   The allegations contained in paragraphs 1 through 42 and 47 and 48 of this Indictment are realleged and incorporated as if fully set forth herein.

50.   On or about the dates set forth below, in the Southern District of New York and elsewhere, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, unlawfully, willfully and knowingly, directly and indirectly, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit

27

upon other persons, to wit, SHERESHEVSKY made or caused to be made false representations to investors regarding their investments in preferred membership interests set forth below, and omitted to disclose material facts to investors regarding their use and misappropriation of investor funds.

| COUNT | APPROXIMATE DATES | SECURITY | INVESTMENT VEHICLE |
|-------|-------------------|----------|--------------------|
| TWO | March 2004 to August 2008 | Membership Units | Hilltop Ridge Investors, LLC |
| THREE | November 2005 to August 2008 | Preferred Membership Interests | GSA Investors, LLC |
| FOUR | October 2006 to August 2008 | Preferred Membership Interests | West 82nd Street Condominium, LLC |

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

### COUNTS FIVE AND SIX

(Mail Fraud)

The Grand Jury further charges:

51.  The allegations contained in paragraphs 1 through 42 and 47 and 48 of this Indictment are realleged and incorporated as if fully set forth herein.

52.  From in or about 2003, up to and including on or about August 11, 2008, in the Southern District of New York and elsewhere, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a

28

"Josie," a/k/a "Yossi," the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, did place in a post office and authorized depository for mail matter, matters and things to be sent and delivered by the Postal Service, and did deposit and cause to be deposited matters and things, to be sent and delivered by private and commercial interstate carriers, and did take and receive therefrom such matters and things and knowingly would and did cause to be delivered by mail and such carriers according to direction thereon, such matters and things, to wit, SHERESHEVSKY mailed or caused to be mailed the following documents to investors which falsely represented that WexTrust Capital owned investment properties it did not own:

| COUNT | APPROXIMATE DATE OF MAILING | MAILING |
|-------|------------------------------|---------|
| FIVE | September 2006 | Disbursement check and investment summary reflecting "income" from purported ownership interest in Hilltop Ridge Investors, LLC |
| SIX | April 2008 | 2007 IRS Schedule K-1 reflecting "income" from purported ownership interest in GSA Investors, LLC |

(Title 18, United States Code, Sections 1341 and 2.)

29

## COUNT SEVEN

### (Wire Fraud)

The Grand Jury further charges:

53.    The allegations contained in paragraphs 1 through 42 and 47 and 48 of this Indictment are realleged and incorporated as if fully set forth herein.

54.    From in or about October 2006, up to and including in or about August 2008, in the Southern District of New York and elsewhere, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, and others known and unknown, unlawfully, willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme and artifice and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, on or about February 28, 2008, SHERESHEVSKY sent an e-mail to Byers and CC-1 regarding the use of monies from the sale of the West 82nd Street property.

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATION

55.    As a result of committing one or more of the foregoing offenses, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 1341, 1343,

and 371; and Title 17, Code of Federal Regulations, Section 240.10b-5, as alleged in Counts One through Seven of this Indictment, JOSEPH SHERESHEVSKY, a/k/a "Joseph Heller," a/k/a "Josie," a/k/a "Yossi," the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the fraud offenses, including but not limited to a sum of money in the approximate amount of $255 million, which amount represents the total approximate amount taken from investors by SHERESHEVSKY and others in connection with the Ponzi scheme charged in this Indictment.

### Substitute Assets Provision

56.  If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> (i)    cannot be located upon the exercise of due diligence;
>
> (ii)   has been transferred or sold to, or deposited with, a third party;
>
> (iii)  has been placed beyond the jurisdiction of the court;
>
> (iv)   has been substantially diminished in value; or
>
> (v)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

(Title 15, United States Code, Sections 78j(b), 78ff; Title 18, United States Code, Sections 371, 1341, 1343 and 981; Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461; and Title 17, Code of Federal Regulations, Section 240.10b-5.)

_____
Foreperson

_____
PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v. -

### JOSEPH SHERESHEVSKY,

**Defendant.**

### INDICTMENT

S2 08 Cr. 1092 (DC)

(Title 18, United States Code,
Sections 371, 1341, 1343; 15 U.S.C. §§ 78j(b), 78ff;
17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)

PREET BHARARA

United States Attorney.

**A TRUE BILL**

_____
Foreperson.

8-31-10   Filed Indictment. Case assigned to J. Sweet

Gorenstein
U.S.M.J